# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | | |
|---|---|---|
| SANDRA M. BONTRAGER, on her own behalf and on behalf of a class of those similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 3:11-cv-216 |
| INDIANA FAMILY AND SOCIAL SERVICES ADMINISTRATION, MICHAEL A. GARGANO, and PATRICIA CASSANOVA, | ) ) ) ) ) | |
| Defendants. | ) | |

## OPINION and ORDER

Sandra Bontrager is a Medicaid recipient living in Indiana and in need of serious dental procedures including implants and abutments for her mandibular jaw. Everyone admits that these procedures are "medically necessary" as defined by Indiana law. Nevertheless, the Indiana Family and Social Services Administration (the agency that handles the state's Medicaid program) has refused to pay for these procedures because they exceed the new $1,000 annual limit that the Administration has put on dental reimbursements. Bontrager has thus filed this class action suit against the Administration and its individually named administrators (collectively, the "State"), arguing that the State's refusal to reimburse her (and others) for medically necessary procedures in excess of $1,000 violates both Indiana and federal law. Before the Court is Bontrager's Motion for a Preliminary Injunction [DE 6], about which I held an evidentiary hearing earlier this year [DE 26].

This disputes casts us into the byzantine world of state and federal Medicaid laws, regulations, and cases. At bottom, however, the parties essentially agree that these laws,

regulations, and cases require the State to cover all medically necessary dental procedures. So why are we here? Neither party frames their dispute quite this way, but their disagreement is really over what it means to "cover" a procedure: Plaintiffs argue that the State can only really "cover" medically necessary dental procedures by *fully* paying for them; the State argues that it can "cover" medically necessary expenses by *partially* paying for them.

I think this is a close question, but as explained in detail below, I have decided that the State is required to fully cover medically necessary dental expenses. Plaintiffs' Motion for a Preliminary Injunction will therefore be **GRANTED**.

## FACTUAL BACKGROUND

I'll start with the facts, which are essentially undisputed. The Medicaid program is jointly funded by the states and the federal government. It pays for medical services to low-income individuals pursuant to state plans approved by the Secretary of the Department of Health and Human Services. *See* 42 U.S .C. § 1396a(a)-(b). Indiana's Medicaid program is administered by the Office of Medicaid Policy and Planning, a subdivision of the Family and Social Services Administration. States are not required to include dental services in their Medicaid coverage, but Indiana has chosen to do so. *See* 405 IAC 5-14-1, *et seq*.

Before Indiana will pay for certain dental services, the State must determine whether those services constitute a "medically reasonable and necessary service" as defined by 405 IAC 5-2-17. The State has thus put in place preauthorization procedures to ensure that any given service is covered by Medicaid and will be paid. Indiana has contracted with a private company, Advantage Health Solutions ("Advantage"), to handle the preauthorization process and to make a determination as to whether a requested service is a "medically reasonable and necessary

2

service" as defined by 405 IAC 5-2-17. For each preauthorization request, Advantage reviews the specific medical facts and opinions of the provider and makes an independent determination, based upon Advantage's independent medical expertise, that the requested services are required for the care and well being of the patient and are provided in accordance with accepted standards of medical or professional practice.

Plaintiff Sandra Bontrager is enrolled in the Medicaid program. In 2009, Bontrager's dentist determined that Bontrager needed two endosteal implants and two implant abutments for her mandibular jaw. The dentist thus submitted an "Indiana Prior Review and Authorization Dental Request" for these procedures to Advantage. Advantage denied the prior review request on the grounds that the procedures were not "covered dental services."

Some 15 months worth of appeal procedures unfolded from that point. In the end it was determined that Bontrager's requested dental services were in fact "covered services" as defined under 405 IAC 5-2-6 and were "medically reasonable and necessary services" as defined by 405 IAC 5-2-17. With these determinations, Bontrager resubmitted her preauthorization request fully expecting that she could finally get her dental work done.

The State's response must have puzzled Ms. Bontrager. She was told that, although it recognized that the services had been determined to be covered and medically necessary, the approved dollar amount for these services was $0.00. In a subsequent letter, Patricia Casanova, Director of Medicaid in the Office of Medicaid Policy and Planning, stated that "state regulations limit reimbursement of dental services to one thousand dollars ($1000) per recipient per twelve (12) month period." This $1,000 annual limit on Medicaid payment for dental service – newly implemented as of January 1, 2011 – applies regardless of whether a given service has

been determined to be medically reasonable and necessary.

The State implemented the cap as a way to save money (potentially millions of dollars annually) while still covering the vast majority of Medicaid recipients. It seems like a sensible thing to do since more than 99% of Indiana Medicaid participants have annual dental costs of less than $1,000. So the new plan still enables 99 out 100 Medicaid recipients to obtain the dental care that they need. According to the State, invalidating the $1,000 cap could well lead to the discontinuation of the dental program altogether, meaning that no participant would receive the dental care that they need. (Recall that the State isn't mandated to provide *any* dental services.)

Bontrager brings this suit on her own behalf and on the behalf of a similarly situated class on the grounds that the State's refusal to pay for services that have been deemed medically necessary violates both Indiana and federal law. Plaintiffs' Complaint seeks a declaratory judgment that the $1,000 annual cap is a violation of Indiana and federal law. The parties have stipulated to the following class:

> All past, current and future Indiana Medicaid enrollees age twenty-one and older, who from January 1, 2011 (when the $1,000 cap took effect) forward, need, have needed, or will need coverable dental services that are administratively or judicially determined to be medically necessary, that are routinely provided in a dental office, and that cost more than $1,000 per twelve month period.

[DE 22 at 2.]

## DISCUSSION

The sole substantive question at issue in this case is whether the State can place a $1,000 annual limit on dental services, including procedures deemed medically necessary. But before we get there, there is a question whether Bontrager has a private right of action to bring this suit.

As explained below, I ultimately conclude (with reservations) that a private right of action exists and that the $1,000 annual cap runs afoul of Indiana and federal Medicaid laws.

## I.  Private Right of Action under 42 U.S.C. §1396a(a)(10)

The first issue is whether Plaintiffs have a private right of action to bring this suit under 42 U.S.C. § 1983.   A person bringing a viable § 1983 claim must first allege a violation of a federal statutory or constitutional right – not merely a violation of a federal law.  *See Blessing v. Freestone*, 520 U.S. 329, 340 (1997).  To do this, a plaintiff bears the burden of showing that the statute at issue was intended to create an enforceable right.  *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283–84 (2002).  The Supreme Court has emphasized that "it is *rights*, not the broader or vaguer 'benefits' or 'interests' that may be enforced under the authority of [§ 1983]."  *Id.* at 283 (emphasis in original).

*Blessing* explains how courts should determine whether a statute creates an enforceable right. Specifically, it directs courts to consider whether:

> (1) "Congress intended that the provision in question benefit the plaintiff"; (2) the plaintiff has "demonstrated that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence"; and (3) "the statute unambiguously imposes a binding obligation on the States," such that "the provision giving rise to the asserted right is couched in mandatory, rather than precatory terms."

*Ball v. Rodgers*, 492 F.3d 1094, 1104 (9th Cir. 2007) (quoting *Blessing*, 520 U.S. at 340–341). If all three elements are satisfied, a federal right is "presumptively enforceable by § 1983, subject only to a showing by the state that Congress specifically foreclosed a remedy under § 1983."  *Id.* at 1116 (citation and internal quotations omitted).

Plaintiffs bring this case pursuant to 42 U.S.C. §1396a(a)(10).  This section of the Medicaid Act, with more than 50 different subparts, is something of a labyrinth.  But at its core §

1396a(a)(10) is focused on providing all Medicaid recipients with equal access to care. It requires that state Medicaid plans "provide for making medical assistance available . . . to . . . all individuals" who are qualified enrollees of the program . 42 U.S.C. §1396a(a)(10)(A)(i). This subsection has been referred to as the "minimum services" provision. *K & A Radiologic Techn. Servs., Inc. v. Comm'r of Dept.*, 189 F.3d 273, 280 (2d Cir. 1999). Section 1396a(a)(10) also requires that a state Medicaid plan provide "that the medical assistance made available to any individual . . . shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual." 42 U.S.C. § 1396a(a)(10)(B)(i). This subsection has been referred to as the "comparability of services" provision. *Clark v. Coye*, 60 F.3d 600, 602 (9th Cir. 1995).

So as I understand Plaintiffs' claim, Indiana's refusal to exceed the $1,000 annual cap to cover their medically necessary dental procedures violates § 1396a(a)(10) because by doing so Indiana's state plan is no longer "making medical assistance available" to "all individuals." And since the cap prevents some individuals from receiving medically necessary services, the State plan is now providing some recipients with more favorable medical assistance, which violates the requirement under § 1396a(a)(10)(B)(i) that medical assistance "shall not be less in amount, duration, or scope" among various recipients.

So does §1396a(a)(10) create an unambiguous private right of action under the standards articulated in *Blessing* and *Gonzaga*? As Plaintiffs correctly point out, "virtually every court that has addressed the enforceability of 42 U.S.C. §1396a(a)(10) has held that it meets the *Blessing* standard and is privately enforceable." [DE 11 at 2.] *See Miller ex rel. Miller v. Whitburn*, 10 F.3d 1315, 1319–21 (7th Cir. 1993); *Spry v. Thompson*, 487 F.3d 1272, 1275–76 (9th Cir. 2007);

*Watson v. Weeks*, 436 F.3d 1152, 1159–62 & n.8 (9th Cir. 2006); *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 602–07 (5th Cir. 2004); *Sabree v. Richman*, 367 F.3d 180, 190–93 (3rd Cir. 2004); *Pediatric Specialty Care, Inc. v. Arkansas Dep't of Human Servs.*, 293 F.3d 472, 478–79 (8th Cir. 2002); *Westside Mothers v. Haveman*, 289 F.3d 852, 862–63 (6th Cir. 2002); *Crawley v. Ahmed*, 2009 WL 1384147, at *18–19 (E.D. Mich. May 14, 2009); *Michelle P. ex rel. Deisenroth v. Holsinger*, 356 F. Supp. 2d 763, 767 (E.D. Ky. 2005); *Health Care for All, Inc. v. Romney*, 2004 WL 3088654, at *2 (D. Mass. Oct. 1, 2004); *Memisovski ex rel. Memisovski v. Maram*, 2004 WL 1878332, at *9-10 (N.D. Ill. Aug. 23, 2004); *Kenny A. ex rel. Winn v. Perdue*, 218 F.R.D. 277, 293–94 (N.D. Ga. 2003).

The Seventh Circuit's *Miller* decision is of particular importance since of course it is binding on me. The State has tried to discount *Miller* on the grounds that it was decided prior to *Blessing* and *Gonzaga*. [DE 21 at 6, n.2.] But as Plaintiffs rightly point out, *Miller* applied the three-prong test of *Wilder v. Virginia Hospital Assoc.*, 496 U.S. 498 (1990), which *Blessing* and *Gonzaga* both analyzed (and did not overturn) and which the Seventh Circuit has held is still good law: "[a]lthough *Gonzaga University* may have taken a new analytic approach, courts of appeals must follow the Supreme Court's earlier holdings [i.e., *Wilder*] until the Court itself overrules them." *Bertrand v. Maram*, 495 F.3d 452, 456-57 (7th Cir. 2007). *See also Sabree*, 367 F.3d at 192 (*Blessing* and *Gonzaga* elaborated on, but did not overrule, the *Wilder* standard).

Just as courts of appeals must follow Supreme Court precedent, so to must district courts follow decisions by courts of appeals unless and until they have been explicitly overturned. *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 910 (7th Cir. 1994). Thus, given *Miller* and the abundance of other decisions in agreement, I can hardly reach any other

conclusion but that a private right of action exists under 42 U.S.C. §1396a(a)(10).

Were I not bound by this precedent, however, I would almost certainly follow the analysis of the issue in *Casillas v. Daines*, 580 F. Supp. 2d 235 (S.D.N.Y. 2008). In *Casillas*, the plaintiff brought a § 1983 action based on § 1396a(a)(10)(A) that challenged a New York Medicaid regulation that disallowed reimbursement for gender reassignment treatment and services. *Id.* at 237. The court dismissed the suit on the grounds that § 1396a(a)(10)(A) was not sufficiently definitive to be read to have unambiguously conferred a private right of action.

In reaching this conclusion, the court focused on 42 C.F.R. 440.230(d) – which, as discussed in depth later in this opinion, is one of the key federal regulations interpreting § 1396a(a)(10)(A). This section of the federal regulations states that Medicaid agencies "may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures." 42 C.F.R. 440.230(d). *Casillas* focused on the phrase "utilization control procedure" and found that it did not meet the *Blessing* and *Gonzaga* standards of conferring an unambiguous private right of action. As *Casillas* explained:

> The inclusion of "utilization control procedures" as an express basis for "appropriate limits" has several important implications for this case. It captures concepts that do not relate to the care of any one particular patient but looks to actual or expected utilization over a broader population. This focus is inconsistent with a right conferred upon an individual or class of individuals. The "right" conferred in section 1396a(a)(10)(A) is not unambiguously conferred upon any individual or class of individuals because it is subject to "appropriate limits" which are based upon state-wide resources and patterns of usage. . . . Because section 1396a(a), as authoritatively construed, allows for categorical limits on treatments, it follows that [section 1396a(a)(10)(A)]cannot be said to have unambiguously conferred a right upon this plaintiff to a particular service or treatment.

580 F. Supp. 2d at 242-43.

Moreover, even if it could be said that the statute unambiguously conferred a private

right of action, the term "utilization control procedures" is so vague and amorphous in meaning

that it cannot meet the second *Blessing* requirement.  Here's how *Casillas* explained the

problem:

> [Utilization control procedures] is susceptible to multiple plausible interpretations
> and lacks a fixed meaning.  In terms of the second *Blessing* element, it is a "vague
> and amorphous" concept, the application of which would, therefore, strain
> judicial competence. "This is not an instance where a court could readily
> determine whether a state is fulfilling these statutory obligations by looking to
> sources such as a state's Medicaid plan, agency records and documents, and the
> testimony of Medicaid recipients and providers."  The protections could hardly be
> characterized as "clear and specific."  Further, the regulation is not limited to
> "medical necessity" or "utilization control procedures" and a state may also
> employ other "such criteria" in framing "appropriate limits." This enhances the
> vagueness problem.

*Id.* at 243 (citations omitted).

I find it hard to fault this logic.  Indeed, part of the remainder of this Opinion is a struggle

with the "multiple plausible interpretations" of "utilization control procedures," and to my mind

that struggle is compelling evidence that "the right assertedly protected by" section

1396a(a)(10)(A) is "so vague and amorphous that its enforcement . . . strain[s] judicial

competence."  *Blessing*, 520 U.S. at 340-41 (quotations omitted).

Thus, had this been an issue of first impression, I would have held that § 1396a(a)(10)(A)

does not confer a private right of action under the standards articulated in *Blessing* and *Gonzaga*.

But my reading of *Miller* and other relevant precedent leads me to believe that at the present

time the Seventh Circuit has concluded otherwise.  I therefore find that Plaintiffs may proceed

with their case under 42 U.S.C. §1396a(a)(10).

## II.  Medicaid Law and Indiana's $1,000 Annual Limit on Dental Services

### A.  The Landscape of Relevant State and Federal Laws, Regulations, and Cases

The Medicaid program is jointly funded by the states and the federal government. *Wisconsin Dep't of Health & Family Servs. v. Blumer*, 534 U.S. 473, 495 (2002).  The Medicaid statute "gives the States substantial discretion to choose the proper mix of amount, scope, and duration limitations on coverage, as long as care and services are provided in the best interests of recipients." *Alexander v. Choate*, 469 U.S. 287, 303 (1985) (internal quotations omitted).

Federal Medicaid law derives from a mix of statutes and federal regulations.  With respect to rulemaking, Congress has delegated general regulatory authority to the Secretary of Health and Human Services, who in turn has delegated that authority to the Centers for Medicare and Medicaid.  *See* 42 U.S.C. § 1395hh(a)(1).

As noted above, the Medicaid Act requires states to "provide for making medical assistance available to all individuals. . . ." 42 U.S.C. § 1396a(a)(10).  The regulations in turn address the "amount, duration, and scope" of Medicaid services to be provided by the states. Of particular relevance to this case is 42 CFR § 440.230, which states in full as follows:

> (a) The plan must specify the amount, duration, and scope of each service that it provides for--
>
> > (1) The categorically needy; and
>
> > (2) Each covered group of medically needy.
>
> (b) Each service must be sufficient in amount, duration, and scope to reasonably achieve its purpose.
>
> (c) The Medicaid agency may not arbitrarily deny or reduce the amount, duration, or scope of a required service under §§ 440.210 and 440.220 to an otherwise eligible recipient solely because of the diagnosis, type of illness, or condition.

(d) The agency may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures.

42 CFR § 440.230.

A state's participation in Medicaid is voluntary, but once a state enters the program, the state must comply with the Medicaid Act and its implementing regulations. *Alexander*, 469 U.S. at 289, n. 1(1985). Indiana participates in the Medicaid program and is therefore bound by its requirements. Ind. Code 12–15–1–1, *et seq*. Indiana has its own state Medicaid statutes and regulations (promulgated by the Family and Social Services Administration) that are laid on top of the federal laws.

Indiana law defines a "medically reasonable and necessary service" for purposes of the Medicaid program as "a covered service [as defined in 405 IAC 5-2-6] that is required for the care or well being of the patient and is provided in accordance with generally accepted standards of medical or professional practice." 405 IAC 5-2-17. "Covered service" is defined in 405 IAC 5-2-6 as "a service provided by a Medicaid provider for a Medicaid recipient for which payment is available under the Indiana Medicaid program subject to the limitations of this article (405 IAC 5)." As previously noted, although it is not required to do so, Indiana provides Medicaid coverage for dental services. 405 IAC 5–14–1.

Rounding out the complex of Indiana Medicaid law are various state and federal cases, the most important of which for our purposes is *Thie v. Davis*, 688 N.E.2d 182 (Ind. Ct. App. 1997), *trans. den'd*., 698 N.E.2d 1190 (Ind. 1998). In *Thie* the plaintiffs challenged an Indiana regulation that excluded Medicaid coverage for dentures, which an Indiana appeals court concluded violated both federal Medicaid laws and Indiana state Medicaid laws. With respect to federal law, Indiana argued in *Thie* that it was well within its rights to exclude coverage for

dentures because it was simply "exercis[ing] discretion in selecting the treatments to be covered within the dental service category" pursuant to the "utilization control procedures" mentioned in 42 CFR § 440.230 – one of the same argument the State also makes in this case. *Id* at 184.

The *Thie* court disagreed. First, it noted that once Indiana had chosen to cover dental services as part of Medicaid, it was required to provide those services in compliance with federal law. *Id*. Then, after analyzing federal precedent, federal statutes, and 42 CFR § 440.230, the court found that "the federal Medicaid Act requires coverage of medically necessary treatment" and that "[i]f medically necessary treatments are excluded, the coverage is not sufficient in amount, duration and scope to fulfill the purpose of providing the service." *Id.* at 185-86. *Thie* concluded: "the State may limit Medicaid expenditures and Medicaid coverage so long as the limitations are *consistent* with federal Medicaid law," but the denture-limitation was *inconsistent* with federal law, which "require[d] that medically necessary dental treatments be covered." *Id.* at 186 (emphasis added).

The court also concluded that the denture-limitation violated Indiana's Medicaid laws. The State pointed to the pronouncement in Ind. Code § 12–15–21–3(3) that any limitation be "consistent with medical necessity concerning the amount, scope and duration of the services and supplies to be provided." The State argued that this provision allowed for the exclusion of some medically necessary treatment – including dentures – so long as the exclusion was "designed to provide the most services for those persons most in need." *Id.* at 186. The court disagreed, finding that the "unequivocal" language of Ind. Code § 12–15–21–3(3), in conjunction with the Indiana regulations interpreting the statute, established that the requirements under Indiana law were the same as under federal law: "medically necessary

treatments must be covered." *Id.* at 187. Thus, as the court concluded: "federal and state laws mandate Medicaid coverage of medically necessary treatments." *Id.*[1]

Indiana courts reached the same conclusion in two companion cases to *Thie*. *See Davis v. Schrader*, 687 N.E.2d 370, 372-73 (Ind. Ct. App. 1997) ("Here, we again hold that the State must cover medically necessary treatments in service areas in which the State opts to provide coverage."); *Coleman v. Indiana Family and Social Services Administration*, 687 N.E.2d 366, 368 (Ind. Ct. App. 1997) ("[O]nce the State chooses to provide coverage within an optional category, the State must cover medically necessary treatments within that category.").

These Indiana state-court cases analyzed both *state* and *federal* Medicaid law to reach the conclusion that "medically necessary treatments must be covered." *Thie*, 688 N.E.2d at 187. With respect to the Indiana appellate courts' analysis of state law, I am not bound by that analysis, but I am required to give it "great weight." *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d

---

[1]During the preliminary injunction hearing in this case, the State raised a new argument: *Thie*'s holding was inapplicable to the present case because the definition of "medically reasonable and necessary" services had changed since *Thie* was decided. After asking the parties to provide supplemental briefs on the issue, I now view the argument as essentially just another formulation of the arguments the State had already raised. The new argument goes like this: 405 IAC §5-2-17 now states that a "medically reasonable and necessary service" is "a **covered service** … that is required for the care or well being of the patient and is provided in accordance with generally accepted standards of medical or professional practice." 405 IAC §5-2-17 (emphasis added). Moreover, "covered service" means "a service provided by a Medicaid provider for a Medicaid recipient for which payment is available under the Indiana Medicaid Program **subject to the limitations of this article**." 405 IAC 5-2-6 (emphasis added). Finally, the $1,000 annual limit on dental services set forth in 405 IAC 5-14-1(b) is one such limitation of 405 IAC 5-2-6. Thus, in the State's view, dental services over $1,000 are not "covered" services and in turn are not "medically reasonable and necessary services." But there's a circularity to this argument, and whether the State can write a definition of medical necessity in such an elaborate way that the limitations end up excluding some medically necessary services really depends on whether the limitations are valid as either "utilization control procedures" or as limits on the "amount, scope, and duration" of services – issues that are addressed in detail below.

630, 637 (7th Cir. 2002).

I am not held to a similar standard with respect to the Indiana appellate courts' analysis that *federal* Medicaid law also requires that the State cover medically necessary treatments, but that analysis is persuasive and its cogency is underscored by a number of federal appeals court decisions that have reached the same conclusion. *See*, *e.g.*, *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1255 (11th Cir. 2011) (holding federal Medicaid law required state Medicaid agency to provide payment for nursing services that were medically necessary); *Lankford v. Sherman*, 451 F.3d 496, 511 (8th Cir. 2006) ("[F]ailure to provide Medicaid coverage for non-experimental, medically necessary services within a covered Medicaid category is both per se unreasonable and inconsistent with the stated goals of Medicaid."); *Hope Medical Group for Women v. Edwards*, 63 F.3d 418, 427 (5th Cir. 1995) (holding state Medicaid rule limiting coverage for abortions without reference to medical necessity violates the Medicaid Act); *Hern v. Beye*, 57 F.3d 906, 910-11 (10th Cir. 1995) (failure to provide Medicaid coverage for medically necessary abortions unless mother's life was at stake was unlawful because inconsistent with purpose of Medicaid law "to provide qualified individuals with medically necessary care."); *Dexter v. Kirschner*, 984 F.2d 979, 983 (9th Cir. 1992) (holding federal law required the state Medicaid agency to pay for medically necessary in-patient services for eligible persons). *See also Beal v. Doe*, 432 U.S. 438, 445 (1977) ("serious statutory questions might be presented if a state Medicaid plan excluded necessary medical treatment from its coverage").

The inescapable conclusion of all these decisions is that both state and federal law require the State to pay for all procedures judged "medically necessary" for eligible participants. In fact, the State basically concedes this point, but argues that it only has to *partially* cover these

procedures because, "[w]hile *Thie* and *Davis* hold that the State must provide Medicaid coverage for medically necessary procedures, both courts stopped well short of mandating the *extent* of that coverage." [DE 21 at 13 (emphasis in original).] Thus, the real heart of the dispute comes in what it means to actually "cover" medically necessary procedures.

### B.     "Coverage" of Medically Services.

Let's review where all this takes us. The only services at issue in this case are those deemed "medically necessary," like Bontrager's dental work. The parties have therefore stipulated that the class will only apply to Medicaid recipients in need of medically necessary services. *Thie*, *Davis*, and *Coleman* hold that "federal and state laws mandate Medicaid coverage of medically necessary treatments," *Thie*, 688 N.E.2d at 187, and many federal appellate cases have reached the same conclusion. So under both state and federal Medicaid law, Indiana must cover medically necessary dental procedures.

The State believes, however, that even with the annual cap, it *is* covering all medically necessary services. That is, the State argues that it can cover medically necessary services without having "to provide full Medicaid reimbursement" for them. [DE 21 at 11.] As the State explains things, the $1,000 cap "complies with both federal and state law" and is "consistent with medical necessity because it provides *some coverage* for Bontrager's requested procedure," and therefore it "*is not denying coverage* for her medically necessary procedure." [DE 21 at 20; emphasis added.] Thus, as the State puts it in its brief, it "is not excluding certain procedures from coverage wholesale, regardless of their medical necessity. . . . Instead, the State has not only opted to provide dental coverage, but is covering $1,000 of all medically necessary dental procedures." [DE 21 at 14.]

So if the State only provides partial reimbursement for medically necessary procedures, is it actually *covering* those procedures?  As a practical matter, everyone knows what it means when a service is "covered" under their insurance:  the service is paid for by the insurance provider.  And really, that's all the Medicaid system is:  one giant insurance provider paying for covered services.  *Massachusetts v. Sebelius*, 638 F.3d 24, 26 (1st Cir. 2011) ("Medicaid is a health insurance program for low-income individuals.").  As the Seventh Circuit has described it, "Medicaid is a payment scheme . . . . [W]hat is required is a prompt determination of eligibility and prompt provision of funds to eligible individuals to enable them to obtain the covered medical services that they need."  *Bruggeman v. Blagojevich*, 324 F.3d 906, 910 (7th Cir. 2003)

Of course insurance schemes vary, and often an insured will have to pay a portion of the costs of services through a variety of methods, including monthly insurance premiums and co-pays.  Or sometimes the insurance provider will not pay for any services until the insured has hit a yearly deductible.  Under other plans, once the insured has hit a certain annual amount, the insurer covers 80% of the costs and the insured will have to pay for the remaining 20% (or 70%/30%, etc.).  But in all of these instances, once the insured has met his or her obligation – a $10 co-pay, a $5,000 annual deductible, a cap after which the insured and insurer split a percentage of the costs, etc. – the insurance company is on the hook to pay for the remainder of the costs of the service, or at least the vast majority of those costs.  Coverage thus means payment of costs

The State's $1,000 cap on dental services takes this commonsense definition of insurance coverage and turns it on its head.  As the State would have it, it can "cover" medically necessary dental services by paying the first $1,000 dollars of them and then leaving all remaining costs to

16

the Medicaid recipient.  This is a bizarro-world notion of insurance coverage:  once the insurance provider (the State) meets the initial deductible ($1,000), the insured is left covering all the remaining costs.  Under any commonsense notion, this is not insurance "coverage."

Recall, moreover, that the operative statute requires states to "provide for making medical assistance available" to eligible participants. 42 U.S.C. § 1396a(a)(10)(A).  The $1,000 cap prevents Ms. Bontrager from receiving such medical assistance, and therefore the State is not "making medical assistance available" to her and the other class members.  In other words, the cap serves as a roadblock to their receipt of the care they need – meaning they really aren't being "covered" at all.

To be sure, the statutory language "make medical assistance available"– and really the whole issue of whether "coverage" means full or partial payment of costs – is complicated by 42 U.S.C. §1396d(a).  Although the issue was not raised by the parties in their briefing, that provision defines "medical assistance" as: "payment of part or all of the cost of the following care and services or the care and services themselves" including "dental services." *Id*.   Thus, the State's annual cap could be viewed as in fact sufficiently making "medical assistance available" – i.e. covering the costs of care – because, even though the State doesn't cover all of the costs of dental services, it is only required to provide payment for "*part* or all of the costs." Early this year, a dissenting opinion from the Washington Supreme Court made that very argument.  *Samantha A. v. Dep't of Soc. Servs. and Health Servs.,* 256 P.3d 1138, 1146 (Wash. 2011) ("Medical assistance is defined as 'payment of part or all of the cost' of enumerated services like personal care services. 42 U.S.C. § 1396d(a). Thus, in plain terms, the Medicaid statutes do not require a state to cover the entire cost of medical assistance.") (Stephens, J.

dissenting).

For at least four reasons, however, this argument goes nowhere. First, the State has never raised the argument, nor ever relied upon 42 U.S.C. §1396d, at any point in this case, and the argument is therefore waived. Second, the phrase "payment of part or all of the cost" may mean something very different: it may mean that the *federal funds* provided to the states must be used to pay for at least part (or all) of the costs of services. That is how the Ninth Circuit interprets the phrase. *See*, *e.g.*, *Univ. of Washington Med. Cent. v. Sebelius*, 634 F.3d 1029, 1034 (9th Cir. 2010) ("The definition of 'medical assistance' has four key elements: (1) *federal funds*; (2) to be spent in 'payment of part or all of the cost'; (3) of certain services; (4) for or to '[p]atients meeting the statutory requirements for Medicaid.'") (emphasis added); *Phoenix Memorial Hosp. v. Sebelius*, 622 F.3d 1219, 1226 (9th Cir. 2010) ("'medical assistance' means the payment of *federal* funds toward certain services") (emphasis added). Third, the idea that the State need only pay for a portion of medically necessary services is in direct tension with the requirement under 42 C.F.R. § 440.230(b) that states provide each service in an "amount, duration, and scope" sufficient to "reasonably achieve its purpose." If, as is the case with the cap here, partial payment will prevent recipients from receiving a service in its entirety, that service is obviously not achieving "its purpose." Finally, even if it could be said that the State's cap complies with federal law by covering only part of the costs, it would still be in violation of Indiana state law, which does not appear to contain any similar "part or all of the cost"provision.

* * *

I fully understand the State's attempt to limit the costs of its Medicaid program, particularly given the severe economic downturn and the attempts by governments around the

country to implement austerity measures.  But a slew of cases hold that no matter how "pressing budgetary burdens may be, . . . cost considerations alone do not grant participating states a license to shirk their statutory duties under the Medicaid Act."  *Moore*, 637 F.3d at 1259.  *See also Smith v. Benson*, 703 F. Supp. 2d 1262, 1277 (S.D. Fla. 2010); *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 659 (9th Cir. 2009);  *Tallahassee Mem'l. Reg'l. Med. Ctr. v. Cook*, 109 F.3d 693, 704 (11th Cir. 1997).

As noted above, and as the State pointed out in its briefing, striking down the $1,000 cap is likely to mean spending millions of dollars a year more in dental expenses and that "it is possible that the Indiana General Assembly will simply cut state Medicaid funding for dental services altogether."  [DE 21 at 21.]  From a public policy standpoint, it would obviously be sub-optimal if striking down the cap means Indiana goes from covering the dental needs of 99% of Medicaid participants to covering none of them. So while I am sympathetic to Ms. Bontrager and other class members who need dental services that would be denied under the cap, the unintended consequences of this lawsuit may be that the State will simply withdraw coverage for dental services altogether, a move other states have resorted to recently.  *See*, *e.g.*, Kevin Graham, *Dental Dilemma: Thousands Affected as Washington Withdraws Medicaid Coverage for Nonemergency Oral Care*, The Spokesman-Review, Jan. 4, 2011 at 1A.

But all of this is neither here nor there.  I am not charged with deciding whether the cap makes for good public policy or whether bringing this lawsuit was a wise choice for those who care about needy citizens and their dental care.  Instead, I have to decide whether the cap complies with federal and state Medicaid laws and regulations.  Since "federal and state laws mandate Medicaid coverage of medically necessary treatments," *Thie*, 688 N.E.2d at 187, and

since the cap prevents Indiana from covering some medically necessary treatments, I can only conclude that it is in violation of both federal and state Medicaid law.

III.     The State's Argument

Necessarily embedded in the conclusion that the cap violates federal and state Medicaid law is a rejection of the State's various arguments about why it believes the cap is in compliance with this law.  The state has three interrelated and overlapping arguments in this regard.  First, the State argues that the cap does not act as a categorical exclusion of services, as was the case in *Thie*.  Second, the State points to 42 CFR § 440.230(d)'s statement that an "agency may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures" and argues that the "$1,000 limit is exactly that – a utilization control procedure designed to appropriately limit the amount of dental services for which the state will provide reimbursement."  [DE 21 at 10.]  Lastly, in the State's view the cap complies with 42 CFR § 440.230(b) and the similar state regulations at Ind. Code § 12-15-21-3-(3) regarding the "amount, scope and duration" of services because, by being sufficient to still service 99% of Indiana Medicaid recipients," the "$1,000 cap is sufficient in amount, duration and scope to reasonably achieve its purpose."  [*Id.*]

I'll turn now to each of these arguments and demonstrate why they are unable to carry the day for the State.

A.  The Cap as a Categorical Exclusion of Medically Necessary Services

The State first argues that the $1,000 cap "does not completely exclude any procedure that is deemed medically necessary, and therefore is consistent with *Thie* and *Davis*."  [DE 21 at 14.]  The State believes it "is not categorically limiting procedures that are medically necessary;

it simply places an annual dollar amount limit on such procedures." [*Id.*] So while the State recognizes it cannot categorically exclude specific procedures like dentures (as in *Thie*) or dental implants and abutments (Bontrager's medically necessary procedures), it argues that the cap does not categorically exclude any procedures.

But of course the cap *does* "completely exclude" *some* procedures that are deemed medically necessary: any procedure that costs more than $1,000. This obvious conclusion was reached by another court in a similar case involving an annual Medicaid cap. In the mid-1980s the Texas Department of Human Services placed a $50,000 cap on inpatient hospital expenses that Medicaid would pay during a 12–month period. Two plaintiffs who needed liver transplants challenged that annual cap in *Montoya v. Johnston*, 654 F.Supp. 511 (W.D. Tex. 1987). Since a liver transplant cost approximately $200,000, the $50,000 annual Medicaid cap functionally excluded that procedure from Medicaid coverage, despite the fact that the transplants were unquestionably "medically necessary." *Id.* at 512. The court held that this sort of categorical exclusion was impermissible: "the $50,000 Medicaid cap is arbitrary and unreasonable in that it functionally excludes the Plaintiffs' liver transplants from medicaid coverage." *Id.* at 514. Although *Montoya*'s reasoning is based largely on 42 CFR § 440.230(c), which only applies to "required" services and thus not to the optional dental services at issue in this case, its conclusion that an annual cap functions as an impermissible categorical limitation obviously parallels this case.

In this case the parties have already stipulated that the Plaintiffs' requested dental procedures are "medically necessary." And similar to *Montoya*, because some of these procedures cost more than $1,000, Indiana's annual cap "functionally excludes" those

procedures from dental coverage.[2]  The Eighth Circuit has concurred with this reasoning, citing

*Montoya* for the principle that "a ceiling on transplant funding so low as to prevent a patient

from getting on a hospital waiting list – let alone actually pay for the surgery – would in fact

deprive her of a transplant . . . and would be impermissible."  *Ellis by Ellis v. Patterson*, 859

F.2d 52, 56 (8th Cir. 1988).  This same logic applies here:  it is "impermissible" for Indiana to

place "a ceiling" on some dental procedures "so low as to prevent a patient" from receiving those

procedures.

### B.  Utilization Control Procedures

The State also relies heavily on the idea that a $1,000 cap is a permissible "utilization

control procedure" under 42 C.F.R. § 440.230(d).  As already noted, however, "utilization

control procedure" is left undefined in the regulations, and thus "the phrase is susceptible to

multiple plausible interpretations and lacks a fixed meaning."  *Casillas*, 580 F. Supp. 2d at 243.

A review of how the term has been analyzed in other cases, however, indicates to me that

utilization control procedures are generally procedures that prevent inefficiency, fraud, and

abuse.  For example, a preauthorization process – like the one Bontrager has already been

through – is a classic example of a utilization control procedure.  *See, e.g., Ladd v. Thomas*, 962

---

[2] Of course, the cap only "functionally excludes" any procedure that by itself costs more than $1,000.  This creates a potential problem with the way the class of Plaintiffs is defined here, which includes all Medicaid recipients who hit the $1,000 cap in a year, regardless of whether they hit it like Bontrager (where a single implant or abutment alone may cost more that $1,000) or whether they hit it by, say, their eleventh $100 medically necessary cavity filling.  The problem of categorical exclusion obviously applies to the former (every one of those procedures will be barred), but arguably not to the latter (as 10 out of the 11 cavities will still be filled).  Ultimately, however, this issue does not undermine the commonality of the class because, as explained above, the $1,000 cap is invalid on other grounds that apply to all class members (i.e. the State is not "covering" medically necessary services when it only pays for a portion of them).

F. Supp. 284, 294-95 (D. Conn. 1997) (noting the prior authorization process is "one of the accepted utilization control procedures that can be employed as a limitation" on services by authorizing Medicaid payment only for those services that are medically necessary); *DeLuca v. Hammons*, 927 F. Supp. 132, 136 (S.D.N.Y. 1996) (same). The auditing of medical services to prevent fraud and abuse by Medicaid providers is another common utilization control procedure. *See*, *e.g.*, *Moore*, 637 F.3d at 1234, n. 24.

Ultimately, I agree with the Plaintiff that classic utilization control procedures "limit utilization of services to only services that are necessary and efficient." [DE 30 at 5.] They are intended to ensure that Medicaid pays only for those services that are medically necessary and cost-efficient by using procedures to catch fraud and unnecessary services. This point is underscored by 42 U.S.C. §1396a(a)(30)(A), which requires states to "provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan … as may be necessary to safeguard against *unnecessary* utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available . . ." (emphasis added). Indiana's own regulations similarly emphasize the idea that utilization control procedures are meant to prevent fraud and inefficiency, as they demand that the State "safeguard against overutilization, fraud, abuse, and utilization and provision of services that are not medically reasonable and necessary." 405 IAC 5-1-1(a)(3).

The State points to *Grier v. Goetz*, 402 F.Supp.2d 876 (M.D. Tenn. 2005), in which the court held that Tennessee's imposition of a limit of five prescriptions per month for Medicaid recipients was an appropriate utilization control procedure. It is true that this holding sees

utilization control procedures as a way of limiting services rather than as a buttress against inefficiency, fraud, or abuse. But to my mind *Grier* raises a different distinction – the difference between limiting a quantity of services (five prescriptions per month) versus limiting the reimbursement of those services. That distinction is really about the issue raised in the next section: whether the annual cap complies with the regulations regarding the amount, duration, and scope of services provided.

### C. Limits on the Amount, Duration, and Scope of Services

As noted, the State also believes that the $1,000 cap is a permissible limit on the "amount, duration, or scope" of a service.

Once again, however, the State's position is problematic. Understanding its issues requires a close reading of the § 440.230(b), which states that "*each service* must be sufficient in amount, duration, and scope to *reasonably achieve its purpose*." 42 C.F.R. § 440.230(b) (emphasis added). The State clearly reads the regulation to mean that the provision of all dental services, taken as a whole, must be sufficient in amount, duration, and scope such that, as a whole, those services reasonably achieve the purpose of providing Indiana citizens with dental coverage. Thus the State repeatedly asserts that the cap is sufficient in amount, duration, and scope because "the great majority of Indiana Medicaid recipients are served by reimbursement for dental services of less than $1,000 in an annual period." [DE 21 at 18.]

But there's an artifice to this argument which comes from State's distorted analysis of the language in § 440.230(b). Take the State's summary of its argument as an example:

> The bottom line is that Indiana has chosen to implement a utilization control
> procedure with regard to the optional dental services it covers which is fully
> authorized under 42 C.F.R. § 440.230(d). That utilization control procedure is
> "sufficient in amount, duration, and scope to reasonably achieve its purpose" (*i.e.*

covering dental services) for more than 99% of Indiana Medicaid recipients. 42 C.F.R. § 440.230(b). As such, it complies with 42 C.F.R. § 440.230(b).

[Id. at 19].

To see the sleight-of-hand here, notice that the State's formulation of the argument is that the *utilization control procedure* is "sufficient in amount, duration, and scope to reasonably achieve its purpose (*i.e.* covering dental services) for more than 99% of Indiana Medicaid recipients." The problem is that § 440.230(b) doesn't say that a *utilization control procedure* has to be sufficient in amount, duration, and scope to reasonably achieve its purpose. If it did say that – and if it could be agreed that the $1,000 cap qualifies as utilization control procedure – then it would be fairly easy to conclude that a utilization control procedure that covers more than 99% of Medicaid recipients reasonably achieves its purpose. But the regulation does not require that a utilization control procedure reasonably achieve its purpose – it requires that *each service* provided by Medicaid reasonably achieve its purpose. Those are completely different things.

So the question is decidedly *not* whether the annual cap, as a purported utilization control procedure, is sufficient in amount, duration, and scope to reasonably achieve its purpose of providing dental services to most Indiana Medicaid recipients. Rather, the question is whether the State is providing each service in a sufficient amount, duration, and scope such that the service reasonably achieves its purpose. And in the context of this case, the relevant corollary question is: Is the annual cap *preventing* the State from providing each service in a sufficient amount, duration, and scope such that the service reasonably achieves its purpose?

The answer is clearly, "Yes." The $1,000 cap prevents recipients from receiving any service in excess of $1,000 – and when a service goes completely unprovided, it has obviously

not been provided in an amount sufficient to achieve its purpose.[3]

The State tries to get around this issue by highlighting cases in which other states properly limited the amount or duration or scope of a service. But those cases are instances where states actually *provided* a service but then limited the *quantity* in which it was provided. For instance, the Eleventh Circuit recently remanded a case to a Georgia district court in order to assess whether "the limits the state imposed on [plaintiff's] physician's discretion in reducing her nursing hours from 94 to 84 hours a week are not reasonable – that these limits are not sufficient in amount, duration, and scope to reasonably achieve the treatment's purpose." *Moore*, 637 F.3d at 1258. *See also Freeman v. State of Washington, Dept. of Social Services*, 2010 WL 3720285 (W.D. Wash. 2010) (reduction in the number of personal care service hours for individuals with disabilities); *Grier*, 402 F. Supp. 2d at 911 (five prescriptions per month);

---

[3]There is also an unresolved question about what the phrase "each service" refers to in § 440.230(b). It could be taken in one of two ways. First, it could mean more broadly each category of service available under Medicaid. In this reading, one service would be the provision of dental services. This is clearly the way the State hopes to interpret § 440.230(b), as it slips in the parenthetical phrase "*i.e.* covering dental services" to suggest that the "purpose" that must be "reasonably achieved" is "covering dental services" On the other hand, the regulation could properly be read more narrowly to mean that "each [*individual*] service must be sufficient in amount, duration, and scope to reasonably achieve its purpose." Under this reading, the "purpose" that must be achieved is not the general provision of dental services to Indiana citizens as a whole; rather, the "purpose" that must be achieved is the reasonable fulfillment of each various dental service (dentures, abutments, etc.). Examples from other cases seem to be all over the spectrum and often don't even address, much less resolve, this ambiguity. *See, e.g.*, *M. R. v. Dreyfus*, 767 F. Supp. 2d 1149, 1172-73 (W.D. Wash. 2011) (analyzing § 440.230(b) somewhat broadly with respect to "in-home personal care service"); *Casillas*, 580 F. Supp. 2d at 246 (reading § 440.230(b) more narrowly to mean that it "would require a plan to provide that a patient hospitalized, for example, with a diagnosis of pneumonia receive treatment for that condition that was 'sufficient in amount, duration, and scope to reasonably achieve its purpose.'"). In this case, I think this ambiguity can remain ultimately unresolved because, even if the regulation is read more broadly, it is not dispositive as the question of whether the State can "cover" medically necessary dental services by only paying for a part of them.

*Charleston Memorial Hospital v. Conrad,* 693 F.2d 324, 330 (4th Cir. 1982) (reduction in number of total days in a year that Medicaid recipients could have inpatient and outpatient hospital visits); *Curtis v. Taylor,* 625 F.2d 645, 653 (5th Cir. 1980) (state regulation limiting recipients to three physician office visits per month).

In each of those instances, the services were provided, just in a circumscribed way (number of hours, visits, prescriptions, etc.). Here, on the other hand, any services over $1,000 are not being provided *at all*.

## IV.    Preliminary Injunction Standard

Having untangled the substantive questions of Medicaid law, the preliminary injunction analysis is relatively straightforward.

To justify a preliminary injunction, a plaintiff must show four elements: (1) she is likely to succeed on the merits, (2) she is likely to suffer irreparable harm without the injunction, (3) the harm she would suffer without the injunction is greater than the harm the injunction would inflict on the defendant, and (4) the injunction is in the public interest. *Judge v. Quinn*, 612 F.3d 537, 546 (7th Cir. 2010) (citing *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008)). The Seventh Circuit has emphasized that "[t]hese considerations are interdependent: the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted." *Quinn*, 612 F.3d at 546. Likewise, "the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be." *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009).

Given the preceding analysis of Medicaid law, there can be little doubt that Plaintiffs

satisfy the four preliminary injunction elements. First, as explained in detail above, the Plaintiffs are likely to succeed on the merits because the $1,000 cap violates federal and state Medicaid laws. Second, they are likely to suffer irreparable harm without the injunction because they will not receive medically necessary dental services in excess of $1,000. As other courts have found, "[i]n cases alleging that a state law violates the federal Medicaid statue and requesting injunctive relieve, irreparable harm nearly always follows a finding of success on the merits." *Benson*, 703 F. Supp. 2d at 1278. *See also Maxwell-Jolly*, 572 F.3d at 658 ("This court has previously held that Medi-Cal recipients may demonstrate a risk of irreparable injury by showing that enforcement of a proposed rule may deny them needed medical care."); *Mass. Ass'n of Older Am. v. Sharp*, 700 F.2d 749, 753 (1st Cir. 1983) (same); *Beltran v. Myers*, 677 F.2d 1317, 1322 (9th Cir. 1982) (same).

Third, the balance of harms also favors the Plaintiffs. The importance of this factor is mitigated by the strength of the Plaintiffs' position on the merits. *See Quinn*, 612 F.3d at 546 ("[T]he greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted."). And while I appreciate the State's position that it will be harmed by having to spend additional limited resources on dental services, it is clear that "neither the gravity nor the difficulty of funding Medicaid obligations [can] excuse a violation of federal law." *Benson*, 703 F. Supp. 2d at 1277. The same goes for the analysis of the public-interest factor: "State budgetary considerations do not therefore, in social welfare cases, constitute a critical public interest that would be injured by the grant of preliminary relief. In contrast, there is a robust public interest in safeguarding access to health care for those eligible for Medicaid, whom Congress has recognized as 'the most needy in the country.'"

*Maxwell-Jolly*, 572 F.3d at 659.

## CONCLUSION

Accordingly, for the reasons detailed above, Plaintiffs' Motion for Preliminary Injunction [DE 6] is **GRANTED**. The parties Joint Stipulation to Certify Cause as a Class Action [DE 22] and their Joint Stipulation of Facts [DE 25] are all also **GRANTED**. Based on the granting of DE 22, Plaintiffs' Motion to Certify Class [DE 5] is **DENIED AS MOOT**.

A preliminary injunction, without bond, is therefore issued in this case as follows:

For all current and future Indiana Medicaid enrollees age twenty-one and older, Defendants Indiana Family and Social Services Administration, Michael A. Gargano, and Patricia Cassanova are enjoined from enforcing 405 IAC 5-14-1(b) and are required to provide Medicaid payments for coverable dental services that are administratively or judicially determined to be medically necessary and that are routinely provided in a dental office, including such services in excess of $1,000 annually.

A telephonic hearing is **SET** for **November 10, 2011 at 10:00 a.m. Hammond/Central Time**

The parties are **ORDERED** to notify the Case Management Deputy by email at simon_chambers@innd.uscourts.gov by **November 8, 2011 at 5:00 p.m.** as to the following: 1) which attorneys will be participating on the conference call; and 2) what telephone number should be used to contact those attorneys.

**SO ORDERED.**

Entered: November 4, 2011.

 s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT